**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____X
JEFFREY MILLER,

                    **Plaintiff,**                           Case No.

   **-against-**

                                           **COMPLAINT**

**AUSTIN LLOYD, INC., CHRISTOPHER M.**
**PARADISE, PATRICK J. WHITE,**
**P. WHITE HOLDINGS, LLC and**
**MIKE TODD,**

                    **Defendants.**
_____X

Plaintiff, Jeffrey Miller ("Miller" or "Plaintiff"), complaining of Defendants, Austin Lloyd, Inc. ("ALI"), P. White Holdings, LLC ("PWH"), Christopher M. Paradise ("Paradise"), Patrick J. White ("White") and Mike Todd ("Todd"), respectfully alleges:

## NATURE OF THE CASE

**1.**     This action is brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO), and New York law by Jeffrey Miller against Christopher M. Paradise (RICO Person), Patrick J. White (RICO Person) and Mike Todd (RICO Person)(collectively the "RICO Persons") operating by and through Austin Lloyd, Inc. (RICO Enterprise) and P. White Holdings, LLC (RICO Enterprise) independently for their unlawful, false, misleading and unconscionable misrepresentations and sales tactics that resulted in direct damages to Plaintiff of approximately Fifty-Two Thousand Seven Hundred Seventy-Eight and 47/100 Dollars ($52,778.47) through a systematic pattern of fraud involving the purchase of precious metal coins that are not worth the value at which they were purchased and will never attain the value as claimed or return on investment as represented. Miller seeks restitution of his actual

1

damages, plus consequential damages, punitive damages, pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

**2.** Upon information and belief, the RICO Persons, Paradise, White and Todd, conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises, Austin Lloyd, Inc. and P. White Holdings, LLC through an open-ended pattern of racketeering activity as set forth herein. At all relevant times, the RICO Persons' wrongful actions were committed willfully, maliciously, with intent to injure and damage Miller, and with reckless disregard of his legal rights. The Defendants' relationship with Miller does not represent a one-off transaction but rather were representative of and were part and parcel of the RICO Persons' normal pattern and scheme through which they have defrauded—and continue to defraud—hundreds of other unsuspecting consumers out of tens of millions of dollars.[1]

**3.** Plaintiff seeks to rescind the coin sales Defendants wrongfully made to him and/or recovery of actual damages, consequential damages, exemplary damages, treble damages under 18 U.S.C. § 1964, pre- and post-judgment interest, attorneys' fees, litigation expenses, and costs of suit.

## JURISDICTION AND VENUE

**4.** This Court has original subject-matter jurisdiction over the RICO claims pursuant to 29 U.S C. §1331, 18 U.S.C. §1964, and 18 U.S.C. §§1961 et seq.

**5.** Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C § 1391(a) because at all relevant times at least one Defendant resided, was found, had agents, and/or conducted business in this District. Moreover, at all relevant times,

---

[1] *See, e.g., Mauch v. Austin Lloyd, Inc., et al*., Case No. 2:22-cv-04180 (E.D.N.Y.) filed July 16, 2022. Defendants defrauded Stephan E. Mauch out of $1.8 million  The matter settled prior to an answer being filed. Counsel for Plaintiff are preparing additional complaints on behalf of other victims against these same Defendants arising from similar fraudulent coin sales and transactions.

Defendants sold the precious metal coins at issue to Miller while they were residing in the Eastern District of New York. A substantial part—if not all—of Defendants' wrongful acts and omissions occurred in this District.

## PARTIES

6.      Plaintiff, Jeffrey Miller ("Miller"), is a citizen and resident of Texas.

7.      Defendant Austin Lloyd, Inc. ("ALI") is a privately-held corporation organized under the laws of the State of New York with its principal place of business located at 48 S. Service Road, Melville, New York 11747.

8.      Defendant P. White Holdings, LLC ("PWH") is a limited liability company organized under the laws of the State of New York with its principal place of business located at 1019 Fort Salonga Road, Suite 112, Northport, New York 11768.

9.      Defendant Patrick J. White ("White") is a New York citizen and resident of Suffolk County, New York with a last known residential address at 3 Sweet Hollow Road, Huntington, NY 11743-6530 and a business address at 48 S. Service Road, Melville, New York 11747.

10.      Defendant Mike Todd ("Todd")[2] is an alias[3] for Patrick White and other telemarketing sales agents at ALI, all of whom are New York citizens and residents of Suffolk County, New York, with a business address at 48 S. Service Road, Melville, New York 11747.

---

[2]  On information and belief, "Mike Todd" is a fictitious name used by ALI telemarketing sales agents to make it difficult, if not impossible, for victims of telemarketing fraud to plead their claims with specificity. According to Wikipedia, Michael "Mike" Todd  (born Avrom Hirsch Goldbogen) was an American theater and film producer and the third husband of actress Elizabeth Taylor. Apparently, the ALI-associated Defendants use the *nom-de-fraud* "Mike Todd" because "John Doe" is too obvious.

[3] There is recorded precedent for fraudulent coin dealers and telemarketers to use aliases when interacting with customers/consumers. *See United States v. Romano*, No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *20 n.6 (E.D.N.Y. 2013) ("Michelle Stumpf testified at trial that the Defendants and their salespeople used false names when interacting with customers").

11.     Defendant Christopher M. Paradise ("Paradise") is a New York citizen and resident of Suffolk County, New York, with a last known residential address at 12 Mallard Cove, Centerpoint, NY 11721-1641 and a business address at 1019 Fort Salonga Road, Suite 112, Northport, NY 11768. This address is not a legitimate business address but is merely a UPS Store. Suite 112 is nothing more than a mailbox at the UPS Store.

## FACTS

12.     Jeffrey Miller is an elderly, retired dentist from Minnesota who has relocated to Texas. In May and June of 2022, White and Todd as telemarketing sales representatives of ALI cold-called Miller to offer to sell him gold and silver American Eagle bullion coins that they claimed were valuable and underpriced and that they would be taking to auction for sale in a very short period of time. Miller made two purchases of coins from White and Todd as representatives of ALI in May and June 2022, each for $25,000. In July 2022, Miller sent ALI (c/o Todd) three gold coins he wanted to sell. ALI (c/o Todd) in return sent Miller another Silver American Eagle coin worth a fraction of what the value of his gold coins were worth. In three (3) transactions involving a total of just ten (10) coins, White and Todd on behalf of ALI swindled Miller out of Fifty-Two Thousand Seven Hundred Seventy-Eight and 47/100 Dollars ($52,778.47).

13.     Thereafter, Todd and White, on behalf of ALI, called Miller on multiple occasions to attempt to sell him additional coins. When Miller failed immediately to agree to purchase the coins they were offering to sell him,  Todd and White would mock and laugh at Miller. Todd and White made these calls to Miller during a period in which his wife of fifty years was undergoing and attempting to recover from back surgery.  Unfortunately, there were complications with the surgery and Mrs. Miller passed away from an infection. While Miller was attempting to care for his beloved

wife and assist in her recovery, he was being bombarded by calls from Todd and White, on behalf of ALI, attempting to sell him coins.

14.     ALI markets and sells  collectible numismatic, semi-numismatic, and bullion coins directly to consumers over the telephone and via the internet in collaboration with PWH and under the direction and control of Paradise, White and Todd, the principal owners and persons in control of ALI and PWH, who manage, operate and treat ALI  and PWH as their personal bank accounts in such a way that ALI and PWH are their alter egos because corporate formalities are not followed and separate and distinct books and records are not maintained. ALI and PWH are undercapitalized, and the line between their owner(s)/manager(s) and the entities is substantially blurred to the point that it is difficult, if not impossible, to determine where the individual Defendants end and ALI and PWH begin. ALI and PWH exist as mere tools and business conduits for Paradise, White (and possibly Todd and other owners) which has resulted in an injustice to Miller and the diminution of available resources from which he may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct.

## **FACTUAL BACKGROUND**

### **A.  The Predatory Precious Metals Market**

18.      The precious metals industry is highly complex and nuanced, making it the ideal market for deceptive and fraudulent activity. Precious metals are naturally-occurring metals that carry a high economic value, often due to scarcity or global demand. These metals, including gold, silver, platinum, and palladium, can be sold as physical assets, in the form of bars, bullion, or coins, or as futures contracts or other speculative investments. Although precious metals prices are volatile, they tend to increase during economic turmoil and stabilize during more prosperous times as contrasted with the price fluctuations experienced by more traditional investment products,

including stocks, bonds, and real estate. It is common to see financial reports and media headlines touting the gains in value experienced by precious metals when contrasted against poor yields in other investments during times of economic uncertainty. Interestingly, this market is largely unregulated as "precious metal dealers fall 'within a 'gap'' in the federal regulatory system."[4] For several decades, fraudsters, sharp operators, and con men have taken advantage of this lack of regulation to lure unsophisticated and trusting customers into purchasing precious metals at prices so far above the fair market value as to nullify any reasonable return on investment, thereby resulting in devastating losses of elderly customers' life savings and leaving them with no recourse or chance of recovery.

19.     While there are upstanding, reputable precious metals dealers, a criminal subset (the "coin *fraud* industry"), operating in the penumbra of the reputable dealers, has been a longstanding problem. In late 1983 and early 1984, federal and state authorities initiated a long-awaited crackdown on precious metals dealers operating fraudulent "boiler room" schemes across the country. These precious metals fraudsters and racketeers had bilked investors out of several hundred million dollars.[5] Banking on customers' lack of knowledge, and using the nuances of coin collecting, grading, historical factors and mint populations, unethical coin dealers continue to confuse and confound the reasonable consumer with deceptive claims of significant investment returns and bargains, often rising to the level of, and culminating in, outright fraud and

---

[4]  *See* David J. Gilberg, *Precious Metals Trading-The Last Frontier of Unregulated Investment*, 41 Wash. & Lee L. Rev. 943 (1984) (https://scholarlycommons.law.wlu.edu/wlulr/vol41/iss3/4) for an interesting overview of the precious metals' trading industry.

[5]  *See Commodity Investment Fraud II, Hearings Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs,* 98th Cong., 2d Sess. 145-88 (1984)*; see also War on Florida Boiler Rooms,* N.Y. Times, Nov. 14, 1983; *Regulating Bullion Dealers,* N.Y. Times, Oct. 31, 1983; *Senate to Study Gold Dealers,* N.Y. Times, Oct. 27, 1983; *Bullion Fraud: Who Protects the Investor?,* Chicago Tribune, Oct. 25, 1983.

counterfeiting. The complexities and unfamiliarity of the precious metals industry to the normal consumer provide fertile ground for fraudulent schemes such as those executed by Defendants and experienced to his great detriment by Miller in this case.[6]

**20.**     The ploys used by the Defendants have been condemned by the United States Senate and various Federal and State agencies and commissions. Nine years ago in 2014, a United States Senate Special Committee on Aging conservatively estimated that more than "*10,000 Americans have been victimized through these schemes, with losses around $300 million.*"[7] Unfortunately, while federal and state regulators continue to aggressively pursue the worst actors in the industry, *"many other bad actors are able to continue their shady dealings with impunity."*[8] In other words, these coin fraud schemes have not abated, and dealers such as the Defendants continue to victimize unsuspecting, elderly customers such as Miller.

**21.**     The Federal Trade Commission has testified before the United States Senate that it had "*observed a proliferation of schemes targeting financially-distressed consumers. These schemes have included deceptive telemarketing operators posing as "brokers" and offering precious metals as purported high-profit, low-risk investments. By failing to disclose key information about the investments' terms and high costs, these brokers deceive consumers into believing that the*

---

[6]  *See* note 3, *supra*. In 2010, the FTC identified and described precious metal fraud schemes identical to those at issue here. *See* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-precious-coins-and-bullion-disclosure-act/100923coinsbulliamact.pdf.

[7]  *See Exploring the Perils of the Precious Metals Market*, U.S. Senate Special Committee on Aging, *https://www.aging.senate.gov/download/precious-metals-market-committee-staff-investigation*, at 17 (hereinafter "US Senate Report"*)*.

[8]  US Senate Report at 3.

*investments provide a safe and secure vehicle for savings. Sadly, many Americans have lost their life savings to these unscrupulous operations*"[9] as has, unfortunately, Miller.

22.     The Commodities Futures Trade Commission and numerous States' Attorneys General have filed numerous actions attempting to curtail illegal over-charging for precious metal products.[10]  The New York Attorney General has published a consumer alert specifically warning against "**Coin Swindles**" in which she warns that: "*[s]o called 'rare coins' are often sold to unwary investors who are led to believe that they are a good investment that will increase in value over the years. Representations made about the expected increase in the value of these coins are almost always untrue and part of a scam perpetrated against unsophisticated, often elderly victims.*"[11] However, even though these Federal and State agencies have stepped up enforcement actions*, "many unscrupulous precious metal dealers are still able to cheat customers due to a lack of transparency within the industry and relatively little monitoring of their business practices."*[12]

23.     Government actors aside, the legitimate precious metals industry, comprised of professional numismatists, financial analysts, and reputable dealers, recognizes the creeping taint of fraudulent over-selling of precious metals. In 2019, the Professional Numismatists Guild[13]

---

[9]  *See* https://www.ftc.gov/legal-library/browse/prepared-statement-federal-trade-commission-exploring-perils-precious-metals-market; and https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-precious-coins-and-bullion-disclosure-act/100923coinsbulliamact.pdf.

[10]  *See, e.g.*, http://metalsandbarrickcapitalreceivership.com/wp-content/uploads/2020/10/Complaint.pdf.

[11]  *See* https://ag.ny.gov/common-investment-scams. Other state attorneys general have also issued precious metals fraud consumer alerts. *See, e.g.,* https://www.texasattorneygeneral.gov/consumer-protection/investing-gold-coins (Texas) and https://www.ag.state.mn.us/consumer/publications/CoinDealers.asp (Minnesota).

[12]  US Senate Report at 3.

[13]  The Professional Numismatists Guild (PNG) is a highly regarded nonprofit organization composed of the country's top numismatic experts who adhere to a strict code of ethics in the buying and selling of numismatic items. *See* www.pngdealers.org.

("PNG"), issued warnings about grossly overpriced gold coins.[14] The PNG and the American Numismatic Association ("ANA") developed acceptable industry standards for selling and pricing of the various types of precious metal products. Industry associations have defined limits as to what constitutes a legitimate sales mark-up on precious metal coins to assist consumers to avoid the traps laid by fraudsters. For example, the National Futures Association ("NFA") advises that gold bullion should not be purchased at more than 5-10% above spot price.[15]

### B. The Coin Fraudsters Prey Upon the Elderly.

**24.**     The U.S. Senate Report revealed that the "*overwhelming number of victims in precious metal fraud are seniors*."[16] Likewise, the FBI found that corrupt coin dealers intentionally target the elderly specifically "*because they [are] elderly and [the dealers] thought [they] could get away with it*" and that, while the amounts defrauded as to any individual elderly customer may seem small in comparison to certain other more high profile financial frauds, "*it represents a great deal to the victims – it was one man's life savings.*"[17] In fact, most of the fraud advisories and enforcement actions by the Federal and State agencies focus on the financial exploitation of the elderly at the hands of fraudulent coin dealers.[18] True to form, Defendants in this case targeted the elderly Miller.

### C. The Defendants Use Misleading and False Marketing Claims.

---

[14] *See* https://www.numismaticnews.net/world-coins/beware-of-grossly-overpriced-gold-coins.

[15] The NFA adopted the U.S. Commodities Futures Trade Commission's bright line limits. *See* https://www.nfa.futures.org/investors/investor-newsletters/January-2021.html.

[16] *See* US Senate Report at 16.

[17] *See Fraudster Targeted Elderly Victims*" https://www.fbi.gov/news/stories/the-case-of-the-corrupt-coin-dealer.

[18] *See, e.g.,* https://dfpi.ca.gov/2022/02/01/dfpi-sues-to-stop-68-million-precious-metals-and-coin-fraud-targeting-elderly/.

25.     Relying upon market complexity and lack of oversight of the precious metals industry to their benefit and to their unwitting customers' detriment, Paradise, White and Todd, in their individual capacities as well as their capacities as principals and representatives of ALI and PWH, practice a subterfuge upon naïve and unsuspecting customers/consumers. They operate their telemarketing operation for the sole purpose of selling collectible numismatic, semi-numismatic and bullion coins[19] directly to customers/consumers over the telephone (and/or via the internet and print media advertisement), and, in this case, re-obtaining coins ostensibly to sell "on consignment" while, in reality, stealing those coins. Paradise, White and Todd, in their individual capacities as well as their capacities as principals and representatives of ALI and PWH, make many hundreds of intrastate and interstate sales calls per month — via the telephone — utilizing one or more of the following unlawful, false, misleading, and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry. These unscrupulous sales practices are specifically designed to prevent the customer/consumer from making informed decisions.

   a.  **Misrepresentations of "High-Reward/Low-Risk" Safe Investments:**

   (1)     Claiming that precious metal coins are safe, secure investments that promise significant returns but failing to disclose that the significant markup or fees charged at the time of purchase created a substantial loss of the customer's/consumer's investment simultaneously with the purchase and that the customer/consumer would never recover because the precious metal products would have to appreciate to historical highs that have never been realized just for the customer/consumer to break even;

---

[19]  In this context, the term "numismatic coin" refers to collectible coins whose value is based upon other qualities in addition to the metal content of the coin, such as appearance, population, grade, rarity, and other attributes. "Semi-numismatic coin" refers to a coin whose value partially derives from its numismatic value and mainly from the value of its precious metal content. "Bullion coins" derive their value almost entirely from the fair market value of the precious metal content, commonly referred to as the "spot value."

(2)     Claiming that certain coins are "rare," "valuable," and provide a "better" investment, when in truth such coins have limited numismatic and collectible value (if any) while at the same time ignoring the significant and immediate cost imposed on customers/consumers in the form of fraudulent pricing;

(3)     Claiming that the coins possessed certain qualities and will substantially appreciate quickly with full knowledge that such representations are false and misleading;

(4)     Representing that the coins being offered will outperform other types of investments—without any underlying data to support such assertions;

(5)     Claiming that precious metals represent a "safe haven" in a volatile economic market;

(6)     Claiming guaranteed high returns on the contemplated investment in precious metals, when in truth there is no way to predict the future rate of return on precious metals;

(7)     Convincing the customer/consumer to trade previously-purchased coins for other coins with representations that the customer/consumer will thereby attain a better investment position, when, in fact, the trade results in the customer/consumer experiencing even greater losses;

(8)     Misrepresenting that the customer/consumer benefited from "special pricing" and "early low prices" when the customer/consumer actually paid significant markups (margins) on the coins;

(9)     Misrepresenting that the customer/consumer would realize unusually high rates of return on investment due to various fictitious market conditions;

(10)     Misleading the customer/consumer with false representations as to the "no tax" aspects of precious metal coins by representing that the increased value of such coins are "tax-free" and that the customer/consumer is thereby avoiding tax on the appreciation or rate of return earned and/or misleading the customer/consumer to buy or trade for pre-1933 gold coins and representing that by making such purchases or trades the customer/consumer would avoid tax issues and liability;

(11)    Claiming that investments in numismatic and modern graded bullion are non-reportable or "tax-free" when in truth customer/consumer must ultimately pay taxes on capital gains, irrespective of the classification of the coins;

(12)    Upselling customers/consumers from bullion to numismatics via representations that numismatic coins provide a better investment than bullion when there is no historical basis, much less reliable data, to support that claim;

(13)    Offering a "no-risk money back guarantee" that either is illusory or has significant fees attached to it.; and

(14)    Failing to tell customers/consumers is that the precious metal coins have been marked up over 40% of the market value of the metal and will be bought back at the market value (usually less than melt value) less a liquidation fee or commission.[20]

b. **Misrepresenting the availability of the "rare" precious metal coins:**

(1)    Pressuring the customer/consumer into believing the need to purchase at a purported substantial discount was "immediate" and that the customer/consumer had to "act right away" to achieve large profits or else lose a good deal and that the coins are elusive and will soon become unavailable, thereby creating a sense of urgency for the customer/consumer to consummate the sale; and

(2)    Misrepresenting that numismatics are preferred over precious metals bullion because there is at risk of bullion being "confiscated" by the government[21] when there is no current law under with the government can recall gold nor any way to predict that any item is immune from a theoretical future recall, thereby creating immediate pressure for the customer/consumer to move into numismatics instead of bullion.

---

[20] The State of California has cited an undisclosed 33% markup by Lear Capital as fraudulent. *See California v Lear*, https://docs.simpluris.com/websites/13abd9da-de42-4adb-8903-54649f9c5695/documents/fcc995e5-6132-42f9-8608-aea59c728a84/CA%20Complaint(11118433.2).pdf.

[21] This ploy is based upon President Franklin Roosevelt's 1933 executive order, in which the government recalled most of the gold owned by private citizens but provided an exception for "rare and unusual coins." https://www.presidency.ucsb.edu/documents/executive-order-6102-requiring-gold-coin-gold-bullion-and-gold-certificates-be-delivered. Historically criticized, it was repealed in 1974 by President Gerald Ford. *See* https://www.cmi-gold-silver.com/gold-confiscation-1933/.

**c. Misrepresenting the value of the precious metal numismatic coins:**

(1)     Utilizing data from other, similar numismatic coins that have significantly different attributes and qualities to represent that the coin being purchased is of greater value or potential value than its actual fair market value;

(2)     Misrepresenting that the coin is "rare" or of limited population when the populations used are presented in such a way as to mislead or deceive customers;

(3)     Mis-grading or "upgrading" the coin to justify fraudulent markups; and

(4)     Failing to disclose that the purchase price is over 40% (and often significantly higher) above the market value of the coins and that any return or resell of the coin will be for less than the market value.

**d. Misrepresenting their expertise, experience, and qualifications:**

(1) Falsely claiming that they possess expert knowledge, qualifications, and experience in precious metals when they do not; and

(2) Falsely claiming that they have specialized financial investment knowledge and experience regarding the precious metals market when they do not.

**e. Taking, selling or charging for coins without authority:**

(1)     Illegally charging the customer's/consumer's credit card or banking account information obtained via prior transactions to ship (or, even worse, without shipping) coins to the customer/consumer without her permission or authority and then, when confronted, making false representations to confuse and obfuscate the issues;

(2)     Fraudulently obtaining the customer's/consumer's precious metal coins by offering to "resell" or "auction" the customer's coin collection "on consignment" with no intent of reselling or auctioning the coins, but instead, after receiving the coins from the customer, converting (stealing) the coins for their own use and benefit;

(3)     Fraudulently obtaining the customer's/consumer's precious metal coins by "baiting" customers with claims that the customer's/consumer's coins were worth a great amount, then after receiving shipment of the coins from the customer/consumer, switching the story and paying the customer/consumer only a fraction of the prior estimated value;

(4)     Fraudulently obtaining the customer's/consumer's precious metal coins by claiming some economic or social upheaval (e.g., the COVID pandemic) had created a unique opportunity to sell or buy precious metals, but then only paying the customer/consumer only a fraction of the represented value of the coins; and

(5)     Agreeing to buy the customer's/consumer's coins over time or broker sale of the coins but, after obtaining possession of the coins, failing to honor that agreement.

**f.   Stalling or confusing customers to keep them from discovering or realizing the fraud:**

(1)     Forestalling customer/consumer complaints by utilizing the false pretext that they will broker the resale or auction of the customer's/consumer's coins for a substantial profit, when such inducement was merely intended to stonewall the customer/consumer, obfuscate the transactions, and delay discovery of the fraudulent purchase price at which the coins were sold in the first instance;[22]

(2)     Misrepresenting the present market value of the purchased coins to prevent or delay the customer/consumer from determining the actual market price of the coins; and

**g.   Various other acts and practices that may be uncovered during discovery.**

26.     White and Todd, in their individual capacities as well as their capacities as principals and representatives of ALI and PWH, utilized, and continue to utilize, one or more of the foregoing unlawful, deceptive, false, misleading, and unconscionable sales and business tactics (which have been identified as fraudulent and prosecuted by various governmental entities ) as part of ALI's and PWH's daily on-going business model conducted at the direction of and under the control of Paradise and White. More specifically, White's and Todd's misrepresentations and sales of overpriced coins to Miller, in their individual capacities as well as their capacities as principals and representatives of ALI and PWH's misrepresentations and sales of overpriced coins to Miller,

---

[22] On information and belief (and based on past experience), when discovery does begin, the Defendant coin dealers will claim that they no longer have any relevant documents concerning the transactions at issue (including cost of goods sold, commissions paid to their telemarketer agents on the sales, or any other documents).

conducted at the direction of and under the control of Paradise and White are neither isolated incidents nor unique to Miller's interactions and experiences with ALI and PWH. Rather, utilizing these deceptive and fraudulent tactics, ALI and PWH, at the direction of and under the control of Paradise and White have sold millions of dollars of over-priced coins to thousands of other customers over the course of multiple years, and continue to do so.

27.    ALI and PWH, at the direction of and under the control of Paradise and White, through various telemarketer employees/sales agents, including Todd and White himself, make thousands of intrastate and interstate telephonic sales calls per month and ship these coins by the interstate mails and private interstate delivery services. Using various unscrupulous techniques that prey upon unsuspecting consumers, such as Miller, with little or no knowledge of the intricacies and nuances of numismatics, "upsell" coins at grossly inflated prices and continue their sham until the customer runs out of money, tires of buying coins, or discovers the true value of the fraudulently priced coins. Many times, the Defendants confuse the consumer through a series of exchanges of coins claiming larger profits with different coins, or fail to properly account for coins shipped back to the Defendants claiming they never received the coins, or hold coins of the client "on account" claiming to utilize these assets for trade on other "special" coins or to place such assets in upcoming auctions that never occur then never return the funds or the coins.

### D.  Defendants' Fraudulent Scheme Against Miller

28.    In May 2022, Defendants began working their con game upon Miller, mainly through RICO persons White and Todd. As is common, the scheme began with an unsolicited "cold call." During the initial phone conversation with the ALI telemarketer  (probably White or Todd, but possibly some other unnamed ALI representative), Miller admitted that he knew nothing about precious metals or numismatics. He stated that he was interested in investing in precious metals

but knew nothing about them. He also admitted to having concerns about a lack of "cash flow" in his retirement. White and Todd assured Miller that he could make substantial profits by buying highly graded "modern graded bullion" coins and quickly placing them into auctions. Defendants represented that these "modern graded bullion" coins were of limited populations and highly sought-after. White and Todd (and perhaps other ALI telemarketers, some or all of which may have gone by the "Mike Todd" alias on the telephone), operating on behalf of ALI and under the direction of and control of Paradise and White. These statements made by White and Todd (and perhaps other ALI telemarketers, some or all of which may have gone by the "Mike Todd" alias on the telephone), operating on behalf of ALI and under the direction of and control of Paradise and White, were intentionally false and calculated to induce Miller to purchase coins from ALI despite his expressing concerns about cash flow.

29.    Specifically, on or about May 17, 2022, an ALI telemarketer (Miller is unable to recall with absolute certainty if this was White, Todd, or some other unnamed ALI representative) called Miller with an unsolicited offer to sell him three (3) 2021-W $10 Gold American Eagle MS 70 NGC coins for $25,000, claiming they were undervalued and would sell at an upcoming auction for a substantial profit. Miller agreed and purchased these three (3) coins from ALI. Unfortunately, the combined fair market value of these three coins was a mere $2,400 at the time they were purchased. In short,  Miller immediately sustained a loss of $22,600 at the time of this transaction with ALI.

30.    Next, on or about June 16, 2022, Todd (the alias used by White as well as other ALI telemarketers at the direction of and under the control of Paradise and White), as a telemarketing representative of ALI, called Miller unsolicited and this time offered to sell Miller four (4) 1994-P $1 Silver American Eagle PF-7 Ultra Cameo coins for $25,000. Todd represented that these

coins were undervalued and would sell at an upcoming auction for a substantial profit. Miller agreed and purchased the four (4) coins. The fair market value of these coins was just $3,600 at the time Miller purchased them. In a near mirror image of the first sale, Miller immediately sustained a loss of $21,400 at the time of this transaction with ALI.

31.     To summarize, in May and June 2022, in the course of just two (2) transactions, Miller paid ALI $50,000.00 for seven (7) "modern graded bullion" coins in reliance upon representations by ALI's telemarketing representatives—specifically Todd and White and possibly others who did not give their names or were also using the "Mike Todd" alias—that Miller was getting a fantastic deal and that he would make substantial profits in an upcoming auction. In reality, and unbeknownst to Miller, the fair market value of these seven (7) coins he purchased was only $6,000.00, and the claims and representations of the ALI telemarketers were illusory and false. When the auction date approached, Todd (either White or possibly others using the "Mike Todd" alias) on behalf of ALI, and at the direction and control of Paradise and White, informed Miller that they did not get the price they wanted so they pulled his coins from the auction.[23] Todd and White (and possibly others who did not give their names or were also using the "Mike Todd" alias) suggested Miller buy more coins to sell at an upcoming auction for even greater return. However, according to Todd and White, the "upcoming auction" was "cancelled." In fact, no auction ever occurred. These statements regarding "auctions" were false and intended by Defendants to string Miller and other consumers along and entice them to buy more coins.

32.     In July 2022, Miller sent ALI and Todd three (3) coins to test their earlier representations that they could sell  coins for Miller and send him a check for the sales proceeds.  Miller sent ALI

---

[23] The "cancelled auction" ploy appears to be part of ALI's (and its principals' and telemarketers')_standard *modus operandi*. ALI, through its principals and telemarketing sales agents, including Todd, made substantially identical misrepresentations to Mr. Mauch once it gained possession of Mr. Mauch's coins. *See Mauch v. Austin Lloyd, Inc., et al.*, Case No. 2:22-cv-04180 (E.D.N.Y.) filed July 16, 2022.

(c/o Todd) three (3) gold coins (two Chinese Gold Panda coins (worth ~$500 each) and a Gold Canadian Maple Leaf 1 oz. coin (worth ~$1,778.47)); however, instead of sending Miller a check for these coins, ALI sent him a single Silver American Eagle coin (worth ~$200).

**33.**     With respect to the three (3) coins that Miller sent ALI (c/o Todd), White, with the consent of ALI's other principals, including Paradise, were not about to miss a golden opportunity to defraud and humiliate an elderly customer.[24] Thus, they unilaterally determined that they would "bait and switch" Miller by shipping him back a coin of little value and in return convert and recycle his gold coins to other targets of their fraudulent precious metals sales scheme. Upon information and belief, ALI, White and Todd, with the consent of Paradise and White, stole Miller's three (3) coins and sold them to other ALI customers at grossly  inflated prices, thus, maximizing their gains at Miller's expense.

**34.**     On or about July 24, 2023, unidentified sales representatives at "Austin Coins, Inc." a sister or successor company to ALI, had the temerity to telephone Miller unsolicited and attempt to sell him more coins. Thus, ALI's fraudulent telemarketing cycle continues to the present under the direction and control of Paradise and White with the same script.

**35.**     It is patently obvious that the Defendants' goal from day one was to run a confidence scheme and rob Miller of his life savings. Fortunately for Miller, he was more discerning and less

---

[24] This comports with the evidence adduced at the criminal RICO trial against ALI's principals' and telemarketers' coin fraud spiritual mentors, Michael Romano and William Kearney:

> Patrick Coleman, Defendants' former employee, testified at trial that . . . Mr. Kearney's avowed sales tactics were to "crush weak people" and to "confuse the shit" out of "older people." . . . Daren Mutone, a former employee of Atlantic Coin Galleries, testified at trial that the Atlantic Coin Galleries salespeople would make fun of the victims because they were old and easier to convince. . . .  Mr. Mutone testified that the elderly were "easier to push around," and that Mr. Romano and Mr. Kearney would hear the jokes and push the sales staff to sell even more coins to a victim who showed susceptibility to pressure and manipulation.

> *United States v. Romano*, No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *19 n.5 (E.D.N.Y. 2013).

gullible than most ALI targets. Miller found White and Todd abrasive, rude and uncouth, and he told them he was not going to do any more business with them.

36.     In the two (2) sales transactions Miller had with ALI, ALI's telemarketers, specifically Todd, White and possibly others who did not give their names or were also using the "Mike Todd" alias, misrepresented the value of the coins they were offering him. These misrepresentations were again confirmed on the ALI shipping invoices accompanying the coins ALI shipped to Miller. With respect to the three (3) coins Miller sent ALI and Todd, on ALI's behalf, Todd represented that they would sell the coins and issue Miller a check for the proceeds. These representations proved to be false, as they never issued Miller a check for his coins. Instead, on ALI's behalf, Todd simply sent him a coin of lesser value and converted and absconded with his coins. ALI, its principals and masterminds, White and Paradise, and ALI's telemarketers, specifically White, Todd and possibly others who did not give their names or were also using the "Mike Todd" alias knowingly and intentionally utilized unlawful, false, misleading and unconscionable high-pressure sales tactics to convince Miller to purchase the grossly overvalued coins.

37.     Based upon information and belief, the sales of over-priced coins to Miller are neither isolated incidents nor are they unique to Miller. Using these same fraudulent tactics, these Defendants have sold multiple millions of dollars of over-priced coins to hundreds of other consumers since the scheme's inception in 2017 and continue to do so indicating a continuing open-ended pattern of criminal fraudulent conduct. Published reports from the Better Business Bureau and Business Consumer Alliance indicate that in 2019 and 2021, other consumers were raising the same claims of fraud and illegitimacy described above against these Defendants. Such companies do not stop without government intervention or overwhelming litigation. To this day, the Defendants continue to operate their enterprises in the same fashion and utilizing the same

fraudulent, bullying, harassing, high-pressure sales techniques and schemes which pose a threat of continued criminal activity.

38.     As a direct and/or proximate result of Defendants' above-described wrongful acts and practices, Miller suffered (and continues to suffer) substantial economic damages, which Defendants refuse to remedy.  This case has resulted.

**CLAIMS FOR RELIEF/CAUSES OF ACTION**

**COUNT I**
**MAIL FRAUD AND WIRE FRAUD**
**A Pattern of Unlawful Activity Under 18 U.S.C. § 1961, et seq.**
**(as against RICO Persons WHITE, PARADISE and TODD)**

39.     The preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth at length.

**RICO PERSON Christopher M. Paradise:**

40.     Christopher M. Paradise (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises, Austin Lloyd, Inc. and P. White Holdings, LLC, through a continuous pattern of racketeering activity; to wit: Paradise participated, directly and indirectly, with White, Todd and others, and together they acted with, by, and through various employees, representatives, and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin sales and transactions with Miller and other telemarketing customers that, in turn, generated exorbitant compensation for Paradise. In association with White and Todd, Paradise caused ALI (RICO Enterprise) and PWH (RICO Enterprise)  to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, offers to buy,

broker, sell or auction coins and/or other purchase confirmations to Miller, and numerous other of ALI's telemarketing customers.

41.     By his unlawful acts, Christopher M. Paradise (i) conducted and/or participated in the affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)), and defrauded Miller and other telemarketing customers in the process. Paradise committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, White, Todd and possibly others unknown at this time. Paradise knew that making and/or sending fraudulent solicitations, sales receipts, offers to buy or broker sales and/or purchase confirmations to Miller and other telemarketing customers was fraudulent, misleading, and unlawful. Paradise knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to Miller and other telemarketing customers that, in turn, would generate exorbitant compensation for himself. Paradise engaged in the scheme to take unfair advantage of Miller and other consumers. Paradise's wrongful acts proximately and/or directly caused Miller and other telemarketing customers to be substantially overcharged for the coins.

**RICO PERSON Patrick J. White:**

42.     Patrick J. White (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises Austin Lloyd, Inc.  and P. White Holdings, through a pattern of racketeering activity; to wit: White participated, directly and indirectly, with Paradise, Todd, and others, and together they acted with, by, and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18

U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin sales and transactions with Miller and other telemarketing customers that, in turn, generated exorbitant compensation for White. In association with Paradise and Todd, White caused ALI (RICO Enterprise) and PWH (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, offers to buy, broker, sell or auction coins and/or other purchase confirmations to Miller, and numerous other of ALI's telemarketing customers.

43.     By his unlawful acts, Patrick J. White (i) conducted and/or participated in the affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)), and defrauded Miller and numerous other of Defendants' telemarketing customers in the process. White committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise) to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, Paradise, Todd and possibly others unknown at this time. White knew that making and/or sending fraudulent solicitations, sales receipts, offers to buy or broker sales and/or purchase confirmations to Miller and other telemarketing customers was fraudulent, misleading, and unlawful. White knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to Miller and other telemarketing customers that, in turn, would generate exorbitant compensation for himself. White engaged in the scheme to take unfair advantage of Miller and numerous other of Defendants' telemarketing customers. White's wrongful acts proximately and/or directly caused Miller and other telemarketing customers to be substantially overcharged for the coins.

**RICO PERSON Mike Todd:**

**44.**     Mike Todd[25] (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises Austin Lloyd, Inc.  and P. White Holdings, through a pattern of racketeering activity; to wit: Todd participated, directly and indirectly, with White, Paradise and others, and together they acted with, by, and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin sales and transactions with Miller and numerous other of Defendants' telemarketing customers that, in turn, generated exorbitant compensation for Todd. In association with White and Paradise, Todd caused ALI (RICO Enterprise) and PWH (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, offers to buy, broker, sell or auction coins and/or other purchase confirmations to Miller and numerous other of Defendants' telemarketing customers.

**45.**     By his unlawful acts, Mike Todd (i) conducted and/or participated in the affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)), and defrauded Miller and numerous other of Defendants' telemarketing customers in the process. Todd committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise) to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, White, Paradise and possibly others unknown at this time. Todd knew that making and/or sending fraudulent solicitations, sales receipts, offers to buy or broker sales

---

[25] *See* footnote 2, *supra.* "Mike Todd" is a fictitious person and/or alias used by ALI telemarketers.

and/or purchase confirmations to Miller and other telemarketing customers was fraudulent, misleading, and unlawful. Todd knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to Miller and other telemarketing customers that, in turn, would generate exorbitant compensation for himself. Todd engaged in the scheme to take unfair advantage of Miller. Todd's wrongful acts proximately and/or directly caused Miller and numerous other of Defendants' telemarketing customers to be substantially overcharged for the coins.

46.     White and Todd, under the control and direction of Paradise and White, and with their knowledge and approval, caused the RICO Enterprises to engage in this fraudulent scheme with the intent, inter alia, to (i) shift the burden of proof to Miller and other telemarketing customers knowing that they do not have unlimited resources and have limited knowledge and (ii) generate exorbitant compensation for themselves. The RICO Persons' wrongful actions and fraudulent scheme constitute mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343.

47.     The multiple, repeated, and continuous acts of mail fraud and/or wire fraud described in Paragraphs 14-16 and 28-37, above, plus the active marketing and fraudulent sales to countless other victims[26] over the course of numerous years, constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5). Nothing about the RICO Persons' schemes to defraud Miller and numerous other of Defendants' telemarketing customers indicated that the scheme would ever terminate. Moreover, and independent of the duration of the scheme, their wrongful acts were and are a consistent, regular, and dominant part of the manner in which they participate in and conduct the day-to-day business and financial affairs of the RICO Enterprises, ALI and PWH.

### COUNT II
### VIOLATION OF 18 U.S.C. § 1962(c)
### (as against RICO Persons WHITE, PARADISE and TODD)

---

[26] Including, but not limited to Stephan E. Mauch. *See Mauch v. Austin Lloyd, Inc., et al.*, Case No. 2:22-cv-04180 (E.D.N.Y.) filed July 16, 2022.

**48.**     The preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth at length.

**49.**     ALI and PWH is each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

**50.**     Christopher M. Paradise, Patrick J. White and Mike Todd are each "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

**51.**     Christopher M. Paradise, Patrick J. White and Mike Todd conducted and/or participated in the business and financial affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) through patterns of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

**52.**     The patterns of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) (*see* ¶¶ 14-16 and 28-37, above) by Christopher M. Paradise, Patrick J. White and Mike Todd proximately and/or directly caused Miller to suffer injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, Miller was damaged by, inter alia, the fraudulent and grossly inflated prices he paid for the above-listed coins, the conversion and theft of other coins and the corresponding mental anguish he suffers. Christopher M. Paradise, Patrick J. White and Mike Todd committed these substantive RICO offenses by using ALI and/or PWH to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Miller and numerous other of ALI's telemarketing customers to suffer damages that were reasonably

foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(d) BY**
**CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)**
**(as against RICO Persons WHITE, PARADISE and TODD)**

**53.**     The preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth at length.

**54.**     ALI and PWH is each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d). Christopher M. Paradise, Patrick J. White and Mike Todd are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

**55.**     Christopher M. Paradise, Patrick J. White and Mike Todd conspired among themselves and with other persons (including Jennifer McGuigan, Joe Cormier, Claire Egan, Melissa Hegstrom, Jay Jensen and possibly other persons, the identities of whom are only known by Defendants at this stage in the litigation) within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, they conspired to conduct and/or participate in the business and financial affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(c); 1961(5); and 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

**56.**     The RICO Persons' pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) were the causes-in-fact and proximate cause of Miller's suffering injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit: Miller was damaged by, inter

26

alia, the fraudulent and inflated prices he paid for the above-listed coins, the conversion and theft of other coins and the corresponding mental anguish he suffers. The RICO Persons themselves and through their representatives (including, but not limited to, Jennifer McGuigan, Joe Cormier, Claire Egan, Melissa Hegstrom, and Jay Jensen) agreed to commit these substantive RICO offenses by using the RICO Enterprises (ALI and/or PWH) to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Miller and numerous other of Defendants' telemarketing customers to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their patterns of unlawful activity.

**COUNT IV**
**FRAUDULENT INDUCEMENT**

**57.**    The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

**58.**    White and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White and Paradise, and with their knowledge and approval, utilized one or more of the above-described unlawful, false, misleading, and unconscionable sales tactics to fraudulently induce Miller into the purchases of the over-priced coins. Specifically, Defendants, by and through their employees and representatives, intentionally and fraudulently induced Miller by: misrepresenting material facts which White and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White and Paradise, and with their knowledge and approval, knew were false at the time they were made with the intent to induce Miller into purchasing the coins for the benefit of the Defendants and at the

expense of Miller; misrepresenting that the price paid for the coins was a current fair value of the coins with full knowledge that the coins were not worth a fraction of the value at which they were sold and purchased; misrepresenting that historically the "investment grade" coins realize significant returns, which they do not; misrepresenting that the "certification" adds a substantial value to the coins when it does not; misrepresenting that it takes at least three to five years for a return on investment of the "investment grade" coins to occur, when such return does not occur; misrepresenting that Miller will be able to market his coins for a price similar to ALI's pricing, which he cannot ethically do; and other misrepresentations that may be exposed during discovery. White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, made the above false representations to Miller with the intent to induce Miller into entering the contracts to purchase the coins and to ship coins to ALI for sale or auction. Plaintiff relied upon these misrepresentations to make the coin transactions at issue in this case resulting in substantial losses at the moment of sale and the conversion and theft of Miller's coins.

59.     White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, continued their fraudulent inducement after the original purchases by providing false and misleading sales marketing data to induce Miller into buying more over-priced coins. Defendants made those representations with full knowledge that such representations were false when made with the intent to induce Miller to purchase the grossly overvalued coins which, in fact, he purchased to his financial detriment and Defendants' financial gain. As a direct and/or proximate result of Defendants' false and misleading representations about the overvalued coins, Miller suffered (and continues to suffer) damages in the form of, inter alia, the amounts paid to

Defendants for the coins at issue in excess of any reasonable fair market value (plus commercially acceptable markup), the conversion and theft of Miller's other coins he shipped to ALI for sale or auction and mental anguish damages.

60.     White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, committed the tort of fraudulent inducement in their verbal telephonic sales pitches to Miller regarding "graded coins," "certified coins," and numismatic coins and through the falsehoods, half-truths, and omissions in their inaccurate and false representations of the market values of the coins. Moreover, the false representations and/or omissions by White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiff's rights and interests.

61.     Because Plaintiff justifiably relied upon material misrepresentations by White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, and would never have entered into any contracts or agreements with ALI to purchase the coins at issue absent those misrepresentations, Defendants' wrongful actions constitute fraudulent inducement under New York law.

## COUNT V
## FRAUD AND/OR FRAUDULENT CONCEALMENT

62.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

63.     White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, defrauded Plaintiff pursuant to New York common law. In order to sell the overvalued coins to Miller, White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, utilized one or more of the above-described unlawful, false, misleading and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion/numismatics direct sales industry. Specifically, White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, falsely and/or misleadingly represented to Miller that he was a preferred customer, that Miller "needed the coins," that Miller was "getting a good deal," and that Miller "would not lose any money" on the purchases. White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, also falsely represented the then-current values of the coins with full knowledge that the coins were not worth the value at which they were advertised, sold, and purchased nor will the coins attain the return of investment as promised. This constitutes fraud under New York law.

64.     In addition, Defendants are liable for fraudulent concealment against Plaintiff. The elements of fraudulent concealment are identical to the elements for fraud with the addition that the defendant must have a duty to disclose material information and failed to do so.

65.     White and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White and Paradise, had a duty to disclose to Plaintiff based upon their contractual relationship. In addition, or else in the alternative, White and Todd, and

30

possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, had a duty to disclose to Plaintiff based upon the "special facts" doctrine, which provides that a duty to disclose arises when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair. The "special facts" doctrine is applicable to the present case because the withheld and hidden material information as to the grade, quality, market value, and markups of the coins at issue was "peculiarly within the knowledge" of White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and that the information was not such that could have been discovered by Plaintiff through the exercise of ordinary intelligence.

66.     White and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White and Paradise, and with their knowledge and approval, made the above-detailed false representations to Miller with the intent that he rely upon them and with full knowledge that such representations were false when made. Miller relied on these material and false representations when deciding to purchase the grossly overvalued coins which, in fact, he purchased to his financial detriment and Defendants' obscene financial gain. As a direct and/or proximate result of the false and misleading representations about the overvalued coins by White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, Miller suffered (and continues to suffer) damages in the form of, inter alia, the amounts paid to ALI for the coins in excess of their fair market values, as well as damages related to the conversion of the coins he sent to ALI for purchase, resale or auction and mental anguish damages.

67.     By virtue of the confidential business relationship between Plaintiff and White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and

direction of White and Paradise, Defendants had a duty to disclose the above-described concealed material facts to Plaintiff. Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above-described concealed material facts, are the equivalent of false representations and/or omissions. Such false representations and/or omissions were made knowingly and intentionally by White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, or, at the very least, in reckless disregard of Plaintiff's rights and interests.

68.     Plaintiff justifiably relied on the false representations and/or omissions of White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, to his financial detriment by purchasing the grossly overvalued coins. Defendants' wrongful actions constitute fraud at common law.

69.     White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, concealed their wrongful actions with the intent to mislead and defraud Plaintiff. Plaintiff was not aware of, nor, through the exercise of due diligence, could have become aware of Defendants' wrongful actions until such wrongful actions brought to light by third parties. Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, White and Todd, and possibly other ALI telemarketing salespersons and representatives under the control and direction of White and Paradise, and with their knowledge and approval, had a duty to disclose to Plaintiff the above

32

materially false information. Defendants' failure to do so constitutes fraudulent concealment under New York law.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

**70.**     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

**71.**     Defendants made certain representations to Plaintiff in the course of their business and in transactions in which Defendants had a substantial monetary interest. Defendants negligently supplied false information that guided Plaintiff, a novice as to precious metals, in his purchase of the grossly overvalued coins.

**72.**     Defendants failed to exercise reasonable care and competence in obtaining, confirming the accuracy of, and communicating such information to Plaintiff by, inter alia, utilizing one or more of the above-described unlawful, false, misleading and unconscionable sales tactics typical of the precious metals/coins/bullion/numismatic direct sales industry and/or making the above-described false and material misrepresentations and omissions.

**73.**     Miller justifiably relied on Defendants' negligent misrepresentations when purchasing the grossly overvalued coins, which directly and/or proximately caused him to suffer damages to the financial benefit of Defendants. Miller continued to justifiably rely upon Defendants' negligent misrepresentations in their oral telephonic representations and various print advertisements regarding the grossly overvalued coins, which directly and/or proximately caused him to suffer ruinous damages to the financial benefit of Defendants. Defendants' wrongful conduct constitutes negligent misrepresentation under New York common law.

## COUNT VIII
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349

74.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

75.     Defendants' actions described herein constitute deceptive acts and practices in the conduct of business, substantially affecting trade or commerce in New York in violation of the New York Consumer Protection from Deceptive Acts and Practices, Gen. Bus. Law § 349.

76.     More specifically, Defendants and their telemarketer employees and representatives knowingly and intentionally utilized unlawful, false, misleading, deceptive and unconscionable high-pressure sales tactics to convince Miller to purchase the grossly overvalued coins by, inter alia:

    A.  Misrepresenting attributes of precious metal coins to move customers from bullion to the over-priced numismatic and semi-numismatic coins;

    B.  Claiming that the coins could be held for a short period and then go to auction where they would bring "huge gains";

    C.  Enticing the customer to buy coins to be sold in a special auction wherein the customers would realize large profits and then subsequently claiming the auction was cancelled;

    D.  Misleading customers to send coins back for sale or auction with assurances that the customers would realize large profits, while Defendants possessed actual knowledge that sale or auction would take place, and Defendants would simply convert the customers' coins for Defendants' own profit;

    E.  Stalling customers with fraudulent alleged business interruptions such as auctions cancelling, third-party buyers backing out of sales due to alleged estate issues, accounting issues, banking issues, shipping issues, etc.;

    F.  Confusing the customer by misstating previous representations on trades, returns, values, coins, and various other tactics in an effort to obfuscate the transactions and frustrate the tracking of the transactions;

    G.  Advising customers to purchase "unique" bullion coins, when, in fact, there is nothing unique about the coins;

34

**H.** Trading or holding-for-trade coins with the promise to sell at a profit, when such inducement was merely intended to stall the customer, obfuscate the transactions, and delay the return of the coins or the purchase price or simple conversion of the coins;

**I.** Using grading and marketing to deceptively sell bullion at a premium as some type of "modern numismatics," even though there are very large populations of the high-grade coins and/or the "certification" is commonly duplicated with minor expense;

**J.** Misrepresenting the market value of "certified coins" to prevent or delay customers from determining the actual market price of bullion coins;

**K.** Claiming a volatile market based upon the spot price of gold yet selling bullion coins at such exorbitant and fraudulent prices to make "market price" nothing but a gimmick; and

**L.** Various other acts and practices that may be uncovered during discovery.

77.    As a direct and proximate result of Defendants' unlawful, unfair, and deceptive acts and practices, Plaintiff has suffered actual damages of over Fifty-Two Thousand Seven Hundred Seventy-Eight and 47/100 Dollars ($52,788.47).

**COUNT IX**
**NEGLIGENCE**

78.    The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

79.    Defendants negligently valued, promoted, marketed, advertised, and sold grossly overvalued coins to Plaintiff. This violated and breached Defendants' duty to Plaintiff to exercise reasonable care in valuing, promoting, marketing, advertising, and selling the coins to Plaintiff. Defendants' wrongful conduct directly and/or proximately caused Miller to suffer damages. Defendants' wrongful conduct constitutes negligence at common law.

**COUNT X**
**MONEY HAD AND RECEIVED**

80.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

81.     By their above-described wrongful actions and/or inaction, (1) Defendants received money belonging to Plaintiff, (2) Defendants benefitted from receipt of the money, and (3) under principles of equity and good conscience, Defendants should not be permitted to keep the money. Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds to Plaintiff under the equitable doctrine of money had and received.

## COUNT XI
## UNJUST ENRICHMENT

82.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

83.     Defendants (and possibly other persons and entities, including Defendants' employees and representatives) have been unjustly enriched by (i) being paid an excessive value for coins that are not supported by any reasonable valuation; (ii) using the fraudulently obtained revenues and profits paid by Miller, and (iii) generating a return on the amounts described in (i) and (ii).  Accordingly, Miller seeks to impose a constructive trust over (and recover) all amounts by which Defendants (and possibly other persons and entities, including Defendants' employees and representatives) have been unjustly enriched.

## COUNT XII
## CONVERSION

84.  The preceding factual statements and allegations are incorporated by reference.

85.     Plaintiff has and maintains a possessory right and interest over all funds that Plaintiff invested with Defendants, including the coins shipped to Defendants for "auction" or consignment sale and all profits earned on any sales of said coins.

86.     Plaintiff requested the return of his coins or the proceeds from any sale of such coins.

87.     Defendants had an obligation to forward Plaintiff the proceeds from sale of his coins or else to return the coins to him.

88.     Defendants wrongfully continue to exercise control over Plaintiff's coins or the proceeds from the sale of those coins.

89.     Defendants' wrongful control over Plaintiff's coins or the proceeds of their sale and refusal to return such coins or the proceeds of sale is an interference of Plaintiff's ownership rights.

90.     As a result of Defendants' wrongful control over his funds, Plaintiff has been damaged in the amount $52,778.47 being a loss of the purchase price and consequential damages, as well as interest thereon.

91.     By virtue of the foregoing, Defendants have committed the tort of conversion, and Plaintiff is entitled to damages in an amount to be determined at trial, but in no event less than $52,778.47 plus interest.

## XIII
## ALTER-EGO

92.     Alter-ego liability is established upon a showing that a defendant has complete domination of a corporation in respect to the transaction at issue and that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. Because a decision to pierce the corporate veil will necessarily depend on the attendant facts and equities of the case at issue, there are no definitive rules governing the circumstances when this power may be exercised.

93.     Based upon information and belief, Christopher M. Paradise, Patrick J. White, and Mike Todd, individually and collectively, use the corporate form as an alter-ego and as mere tools or business conduits. They completely dominate ALI and PWH to shield assets and thus cause a diminution of available resources from which Miller may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct. Upon information and

belief, there are undocumented funds transfers between the corporation and the Defendants, and there is an unclear allocation of profit and losses between ALI and the Defendants and/or PWH and the Defendants. In short, ALI and PWH are substantially one and the same with Christopher M. Paradise, Patrick J. Whit, and Mike Todd, or some of them, and the relationship between them is an illegitimate use of the corporate form.

## XIV
## RESPONDEAT SUPERIOR

94.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

95.     Defendants also are liable for the above wrongful acts committed by their employees during the course and scope of their employment by the Defendants; to wit, the employees' and representatives' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the employees/representatives were hired (i.e., selling overvalued coins to customers like Plaintiff)—all of which directly and/or proximately caused Plaintiff to suffer damages to the financial benefit of Defendants—and for which Defendants are liable under the doctrine of *respondeat superior*.

## RELIEF REQUESTED

96.     **RECISSION**.   Based on Defendants' above-described wrongful conduct, Plaintiff is entitled to recission of the transaction(s) at issue by which Defendants fraudulently marketed and sold the grossly overvalued coins to Miller. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

97.     **ACTUAL AND CONSEQUENTIAL DAMAGES.**   As direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered (and continues to suffer) damages in the form of, inter alia, the amounts paid to Defendants for the coins in excess of their value and the

conversion of Plaintiff's coins by Defendants. Plaintiff is entitled to recover consequential damages related to lost investments when he was lured into purchasing the coins and the mental anguish he has suffered in connection with these transactions—in an amount to be determined by the trier of fact. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

98.     **AUTOMATIC TREBLE DAMAGES UNDER 18 U.S.C. § 1964(c).**  Plaintiff also is entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute under 18 U.S.C. § 1964(c).  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

99.     **EXEMPLARY DAMAGES**.  Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiff's rights and interests.  Accordingly, Plaintiff also is entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.

100.    **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS**.  Plaintiff also is entitled to recover his reasonable and necessary attorneys' fees, litigation expenses and court costs actual damages to be determined by the trier of fact.

**WHEREFORE**, Plaintiff requests judgment in his favor and  against the Defendants, jointly and severally, awarding compensatory damages for all actual and consequential losses, treble damages under 18 U.S.C. § 1964(c), exemplary damages, and all amounts by which Defendants have been unjustly enriched; directing an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including the imposition of  a constructive trust and the voiding of unlawful transfers; and awarding attorneys' fees and

litigation expenses pursuant to 18 U.S.C. § 1964(c) and New York G.B.L. § 349(h) and the costs of suit pursuant to 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d); together with pre-judgment interest pursuant to New York C.P.L.R. § 5004 or any higher applicable rate and post-judgment interest at the highest legal rate, and such other and further relief as the Court deems just, proper, and equitable.

Dated: New York, New York
      August 15, 2023

**LAW OFFICES OF KENNETH G. WALSH**

By: */s/Kenneth g. Walsh*
     Kenneth G. Walsh (1654)
     59 Kensico Road, Suite 7
     Thornwood, New York 10594
     (929) 241-7307
     kwalsh@kgwalshlegal.com

**STEVENS LAW FIRM**

By: /s/ R. Lyn Stevens
     R. Lyn Stevens (pro hace vice forthcoming)
     20540 Hwy 46 West
     Suite 115-420
     Spring Branch, Texas 78070
     (409) 880-9714
     Lyn@Stevens.Law

***ATTORNEYS FOR PLAINTIFF,***
***JEFFREY MILLER***